**CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>LIZET SARIOL | DOCKET NO.<br><br>FILED NOV 2 2 2011<br><br>MAGISTRATE'S CASE NO.<br>11- **11-2785M**<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY DEPUTY |

Complaint for violation of Title 18, United States Code, Section 1038(a)(1)

| NAME OF MAGISTRATE JUDGE<br>HON. RALPH ZAREFSKY | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE<br>September 25, 2011 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about September 25, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendant LIZET SARIOL did intentionally convey false and misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, and will take place that would constitute a violation of Title 18, United States Code, Section 32, relating to destruction of aircraft.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>DAVID GATES /s/ |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT - FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>RALPH ZAREFSKY | DATE<br>November 22, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
Initials (EEA) Arrest Warrant/Detention
EEA

AFFIDAVIT

I, David Gates, being duly sworn, hereby depose and state the following:

I. INTRODUCTION AND LEGAL BACKGROUND

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I have been so employed for over eight years.  Since August 2004, I have been assigned to the Los Angeles International Airport ("LAX") Office of the FBI, where I investigate violations of Federal law which occur within the airport environment and on board aircrafts.

2.    This affidavit is in support of a complaint charging LIZET SARIOL ("SARIOL") with a violation of Title 18, United States Code ("U.S.C."), Section 1038: False Information and Hoaxes, for making a false and misleading terrorist threat call to United Airlines on September 25, 2011 in Los Angeles County, California.

3.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.  This affidavit is intended to show that there is probable cause for the requested complaint and does not purport to set forth all of my knowledge or investigation into this matter.

4.    18 U.S.C. § 1038(a)(1) states in part:

Whoever engages in any conduct with intent to convey
false or misleading information under circumstances

where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2 [includes 18 U.S.C. § 32 relating to destruction of aircraft]. . . or 113B [Terrorism] of this title, . . . or section 46502 [Aircraft piracy], the second sentence of section 46504 [Interference with flight crew members and attendants using a dangerous weapon], section 46505(b)(3) or (c) [Carrying an explosive on an aircraft], [or] section 46506 if homicide or attempted homicide is involved, . . . of title 49, shall . . . be fined under this title or imprisoned not more than 5 years, or both . . . .

5.    Chapter 2 of Title 18 listed above contains 18 U.S.C.

§ 32, which states in part:

(a) Whoever willfully—

(1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce;

(2) places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft;

. . .

(5) interferes with or disables, with intent to endanger the safety of any person or with a reckless disregard for the safety of human life, anyone engaged in the authorized operation of such aircraft or any air navigation facility aiding in the navigation of any such aircraft;

(6) performs an act of violence against or incapacitates any individual on any such aircraft, if such act of violence or incapacitation is likely to endanger the safety of such aircraft;

2

. . . or

(8) attempts or conspires to do anything prohibited under paragraphs (1) through (7) of this subsection;

shall be fined under this title or imprisoned not more than twenty years or both.

6.    As explained below, I believe SARIOL violated 18 U.S.C. § 1038 by intentionally conveying false and misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of Title 18 U.S.C. § 32, relating to destruction of aircraft.

II.  DEFENDANT'S TELEPHONE CALL TO UNITED AIRLINES

7.    On September 25, 2011, I received an e-mail from Brent Goodwin, supervisor for the Transportation Security Administration ("TSA") LAX Coordination Center.  The e-mail was titled "UAL Reports Suspicious Call" and was a forwarded message from United Airlines titled "BOMB THREAT: Call from Female passenger."

a.    The text of the original message from United Airlines that TSA Supervisor Goodwin forwarded follows:

> Shan West ELN agent received a call from a female passenger stating that there was going to be an emergency today.  The caller did not want to give her name but she stated she received a threaten text message from one of the parties about a flight to CDG leaving Las Vegas between 8-9am today.  The names of the passengers were Adnen Mansouri this is a full name, and the others she has first name only Annie, Sergio

3

and the remaining names we are unsure of.  The caller also described them as foreigners and she was taken back by the text they left on her phone.  We are not aware of the message that they left her.  The UA Flight that they could be traveling on is UA 644 at 0825 LAX LAS then the Delta flight is 170 LAS SLC CDG departing at 1207.  The caller was unsure why they said this to her.  The caller stated she was going to the airport today to alert the airport the same way she advised UA.

b.    The message from TSA Supervisor Goodwin also included positive identification of two people listed in the United Airlines message, Adnen Mansouri and Salim "Serge" Oumahdi, along with their intended itinerary.  According to TSA Supervisor Goodwin, Mansouri and Oumahdi had reservations on US Airways flight 49 from LAX to Las Vegas on September 25, 2011, departing LAX at 12:35 p.m.

c.    The message from TSA Supervisor Goodwin confirmed there was a Federal Air Marshal team scheduled for this flight and the team would be "advised accordingly" of the call.

8.    On September 28, 2011, I telephonically interviewed Shan West.  West provided, among other things, the following information:

a.    West has worked for United Airlines/Elite Network for fifteen years.  He works at a call center in Detroit, Michigan and handles calls for United Airlines passengers.  In fifteen years, this was the first time West has had an anonymous threat call.

4

b.    West remembered he received the call at approximately 5 a.m. Detroit time on September 25, 2011.  The caller was a woman and she told West that she wanted to report a threat.  West immediately hit the "emergency button" so the call would be recorded and his supervisors would know there was a problem at his station.  West added that apparently the call did not record like it should have.

c.    West said the entire call lasted around three minutes.  The woman refused to give her name, but she wanted to report a threat.  She told West about two guys she met in downtown Los Angeles.  The female told West there were five people total, all "foreigners," and she provided the names of two men and a woman to West.  She added that they were traveling from LAX to Las Vegas to Paris around eight or nine in the morning.

d.    West asked the woman why she felt threatened.  The anonymous female said it was because of a text message she received.  The woman told West she received a text message that was "very threatening" but she did not elaborate to West about the message.  West said she added, "My brother is a police officer so I know about this type of thing."

e.    West said the woman added that she was alerting United Airlines and was going to alert the airport as well.

f.    West took the call seriously.  West believed there was a threat to a plane.  He checked flights and determined there

5

was a United Airlines flight around that time from LAX to Las Vegas but the flight to Paris was on Delta Airlines. West remembered running to his supervisor's control office because he was concerned that they would not have enough time to find the men before their flight took off.

g. West thought the woman was alerting him to a terrorist threat. West said, "I thought it was a bomb. I was real nervous." West confirmed the woman never said the words "bomb" or "terrorists." West said the woman implied it through all the "threat" comments she made. West added, "Bomb was never mentioned. That's what I thought. When you get a call like that, that's what you think. You don't think it refers to a fight." West said that the woman said "threat" three or four separate times during the call.

## III. THE RESPONSE TO THE CALL AND THE FOLLOW-UP INVESTIGATION

9. On September 25, 2011, LAX Police Detective and FBI Joint Terrorism Task Force Officer Eddie Martinez ("Detective Martinez") and I were waiting at the US Airways ticket counter at LAX when Mansouri and Oumahdi checked in.

10. On September 25, 2011, I interviewed Adnen Mansouri at LAX. Mansouri spoke English but occasionally used a TSA screener fluent in French to help communicate certain concepts with the interviewer. Mansouri provided, among other things, the following information:

a.    Mansouri and Oumahdi have been in the United States since early July 2011 on vacation.

b.    When first stopped at the US Airways ticket counter, Mansouri said he and his friend expected problems from law enforcement officers at LAX.  Mansouri said he was not surprised that the FBI was waiting for him at the ticket counter. Mansouri claimed a woman he met in the United States named LIZET SARIOL was harassing him.

c.    Mansouri said SARIOL lived in Temple City. Mansouri met SARIOL at a party in early September 2011.  He saw SARIOL four times in September and acknowledged that he had a sexual relationship with SARIOL.

d.    The last time he saw SARIOL was September 24, 2011.  (I believe it actually was after midnight on September 25, 2011, for reasons set forth below.)  SARIOL came to a home in Beverly Hills where he and Oumahdi were staying.  Mansouri said SARIOL wanted him to go out with her, but he said no.  Mansouri believed one of the reasons SARIOL was mad at him was that he would not go out with her on September 24, 2011.

e.    SARIOL arrived at the Beverly Hills home around 11 p.m. on September 24, 2011.  Mansouri said he and SARIOL talked. During their talk, she cried.  SARIOL left his house around 12:30 a.m.  After she left his house, she started sending text messages.

7

f.    Mansouri added that earlier on the 24th he had deleted SARIOL from his Facebook profile.  Mansouri believed SARIOL was mad at him for that too.  He "un-friended" her on Facebook due to "negative messages" from her.

g.    Mansouri added that her Facebook messages may still be on his Facebook account.  Mansouri and I went to a computer and Mansouri accessed his Facebook account.  Mansouri showed me messages from September 20, 2011 to September 25, 2011 from SARIOL to him, and Mansouri allowed me to print and save the messages.

h.    Mansouri said he was not a terrorist.  Mansouri said he was not a danger to any flight.  Mansouri denied sending threatening text messages to SARIOL.  Mansouri said SARIOL was mad at him and was trying to hurt him because he deleted her from Facebook.

11.    On September 25, 2011, I reviewed messages from SARIOL that were posted to Mansouri's Facebook account.  She posted more than forty (40) messages from September 20, 2011 to September 25, 2011.  In a number of the messages on September 25, 2011, SARIOL expressed animus toward Mansouri and displeasure at the way she perceived she had been treated.  Her messages on September 25, 2011 included the following:

a.    "Really hope you all have a great flight."

8

b.    "Don't even try to get on the plane called the fbi
Sucks to be all of you hope you all have good attorneys."

12.   On September 25, 2011, Detective Martinez interviewed
Salim "Serge" Oumahdi at LAX.   TSA inspector Rose Wong was
present for part of the interview.   Oumahdi, who was fluent in
English, provided, among other things, the following information:

a.    Oumahdi said he expected law enforcement officers
were going to meet him at LAX.   Oumahdi explained that he had
received several text messages on his cell phone threatening and
harassing him.   Oumahdi explained that the text messages were
from LIZET SARIOL, a woman he and Mansouri met in September 2011.
Oumahdi and Mansouri have been in the United States since July 3,
2011, on vacation.

b.    Oumahdi stated that sometime last month, Mansouri
and SARIOL were introduced to each other by "Joanna" at a party.

c.    Oumahdi stated that he had met SARIOL twice.   The
first time was approximately ten days earlier.   Oumahdi
remembered SARIOL because she was not polite to him when they
met.   The second time was on September 24, 2011 when Oumahdi and
Mansouri were staying at a friend's house in Beverly Hills.
Oumahdi and Mansouri were going to spend the night at the home in
Beverly Hills and then leave for LAX the next morning, September
25, 2011.

d.    On September 24, 2011, at approximately 7:00 p.m., Oumahdi went out for dinner.  Mansouri stayed home to watch movies and sleep.  When Oumahdi returned to the house at approximately 1:00 a.m., SARIOL was present with Mansouri. Oumahdi told SARIOL that it was time for her to leave, because they had to wake up early the next morning.  After SARIOL left the house, Mansouri deleted SARIOL from his Facebook page.

e.    Oumahdi explained that Mansouri did not have any more cellular phone roaming credits and that it would be too expensive to receive phone calls from the United States on his French cell phone.  In order to avoid the roaming phone charges, Mansouri deactivated his cell phone and Facebook account. However, Oumahdi kept his cell phone active and he accepted phone calls and text messages for both Mansouri and himself.

f.    At approximately 1:10 a.m. on September 25, 2011, Oumahdi began receiving threatening text messages from SARIOL. Oumahdi said he continued receiving text messages "all morning." Oumahdi believed that SARIOL was angry with Mansouri because he slept with her, deleted her from Facebook, and did not answer any of her phone calls.

g.    Oumahdi forwarded several of the text messages he received from SARIOL to Detective Martinez's e-mail account. Oumahdi also allowed interviewers to take photographs of the messages on his phone.  Oumahdi explained that the messages on

his phone were not everything he had received from SARIOL, as he had deleted some of the messages sent earlier on September 25, 2011.

      h.    Oumahdi said he was not a terrorist and he had not threatened SARIOL at all.

      13.  Detective Martinez provided the following information regarding text messages he reviewed on Oumahdi's cell phone:

      a.    Oumahdi sent six text messages from his cellular phone to Detective Martinez's cellular phone.  Oumahdi stated that he received all these messages earlier on September 25, 2011 from SARIOL.  At least one additional message was photographed by TSA Inspector Wong and me, but Oumahdi did not forward that message to Detective Martinez, for a total of seven known text messages.  Oumahdi stated he had already deleted some messages from SARIOL.

      b.    The seven text messages were sent from SARIOL's cell phone, phone number (XXX)XXX-0302.  The text messages stated the following:

          i.    "Already called the airlines considered you all terrorists including annie"

          ii.    "So glad you are finally leaving our country you were all poisoning it with bad intentions"

          iii. "Hope you like jail"

iv.   "Vegas wont be fun have friend in high places and
      my son is a cop get a good attorney"

v.    "You f----- wig the wrong woman you will never set
      foot in th e US trust me. Never again"

vi.   "Thrust me you will never step foot in tell
      states"

vii.  "F--- you make sure you don't come back and I will
      make sure of that make sure you get arrested"

## IV. DEFENDANT'S INTERVIEWS

14.   On October 4, 2011, Detective Martinez and I
interviewed LIZET SARIOL at a Starbuck's Coffee Shop in Arcadia,
California.  Among other things, SARIOL provided the following
information:

a.   SARIOL stated that she met Adnen Mansouri in
Pasadena, California.  Mansouri and his companion, Salim "Serge"
Oumahdi, were in the United States for three months on vacation.
SARIOL stated she "hung out" with Mansouri while he was in the
United States.

b.   SARIOL said on September 24, 2011, Mansouri
invited her to a house in Beverly Hills.  She said when she
arrived at the house, SARIOL and Mansouri watched movies and she
drank champagne.  Later that evening, Oumahdi and a companion
arrived at the house.  SARIOL said that Oumahdi was "freaking
out" and began speaking in his "native tongue."  Oumahdi told

12

SARIOL that she could not be in the house and she needed to leave.

      c.    SARIOL said after she was kicked out of the house by Oumahdi, she received a "nasty" text from Oumahdi's phone. SARIOL said this "dirty" text from Oumahdi "pissed me off." SARIOL added that after receiving the text message, she was immediately removed from Mansouri's Facebook account. SARIOL told us, "And then I said, you guys f----- with the wrong bitch." SARIOL mentioned that she deleted all of the text messages she received from Oumahdi's phone.

      d.    SARIOL believed that this text message was sent to push her away. She thought the text message was designed to be as mean as possible so that she would not speak to them again. SARIOL said she had a bad experience at the house that night and felt mad and angry with Mansouri and Oumahdi.

      e.    SARIOL acknowledged that she continued contacting Oumahdi and left numerous text messages on his phone.

      f.    SARIOL stated that at approximately 2:00 a.m. on September 25, 2011, she telephoned United Airlines to verify if Mansouri and Oumahdi were telling the truth about leaving on their scheduled flight to France. SARIOL stated she asked the United Airlines phone operator if there was a way to investigate them because she had concerns. She asked if United Airlines could look at their passports because they were suspicious.

SARIOL added she never said they had bombs or weapons.  When asked if she was drunk when she made the call, SARIOL said, "I wasn't drunk because I wouldn't be driving.  I did it from my house on my cell phone.  I don't have a land line at home."  When asked if she actually showed up at LAX looking for them the next day, SARIOL said "No," and explained: "I said, I hope, I go I hope you guys take this serious.  Because if I'm there and you guys aren't doing anything about it, that would be really sad, and this is why things happen because nobody really follows through."

       g.    SARIOL admitted she sent a text with the word "terrorist" in it.

       h.    SARIOL has a son who is a police officer at a local police department.

       i.    SARIOL explained that she did not feel threatened by Oumahdi and Mansouri.  SARIOL said she would have called the police if she felt threatened.

       j.    Several times during the interview, we suggested that SARIOL was "a woman scorned."  SARIOL stated that she was not a "woman scorned," like we suggested; instead, she was "freaked out" and wanted to know why Oumahdi and Mansouri acted so mean towards her.

       k.    SARIOL reviewed the text messages obtained from Oumahdi's phone and the Facebook postings on Mansouri's Facebook

page that she sent.   SARIOL admitted that some of her postings
and messages may have been a mistake.

        l.    When asked about one of her posts that she called
the FBI, SARIOL said, "The airline told me they would convey it
to the FBI."

        m.    Toward the end of the interview, SARIOL said, "I'm
very sorry.  I realize what I did."

        15.    On October 10, 2011, Detective Martinez and I conducted
a second interview of LIZET SARIOL at a Starbuck's Coffee Shop in
Arcadia, California.

        a.    Several times, SARIOL said she knew what she had
done was wrong.  She stated she was remorseful.  SARIOL also
insisted that she was not a "woman scorned" as interviewers
suggested during their previous interview.

        b.    SARIOL added she should not have been thrown out
of the house early in the morning on September 25, 2011 by
Oumahdi.  SARIOL mentioned that her anonymous phone call to
United Airlines was meant to sound suspicious.

        c.    Interviewers showed SARIOL one of the text
messages sent from her cell phone on September 25, 2011.  The
text message read, "Already called the airlines considered you
all terrorists including Annie" ("Annie" is the name of Oumahdi's
companion on September 24, 2011).  SARIOL acknowledged that the
phrase was a poor choice of words.

d.    SARIOL discussed what she did after she received a "dirty" text from Oumahdi early in the morning on September 25, 2011.  SARIOL stated this text message was offensive to her.  She admitted she did not think it was threatening.

e.    She admitted that after receiving the "dirty" text message from Oumahdi she called United Airlines because she was angry with Oumahdi and Mansouri.  SARIOL acknowledged that she had made the phone call to United Airlines in anger.

f.    SARIOL agreed with the interviewers when they suggested she had made the phone call to United Airlines hoping someone else would believe Oumahdi and Mansouri were terrorists.  SARIOL again said she knew what she did was wrong.

g.    The interviewers asked SARIOL if she thought it was reasonable for the United Airlines operator to believe Oumahdi and Mansouri were terrorists based on her phone call.  SARIOL agreed, stating that if she received a telephone call like the one she made, it would be reasonable to assume that the call was about terrorism.

16.   On October 6, 2011, I received the following information from Verizon Wireless:

a.    Phone number (XXX)XXX-0302 belongs to Verizon customer LIZET SARIOL residing at a Temple City, California address.

16

b.    On September 25, 2011 at 1:44 a.m., phone number (XXX)XXX-0302 called "411."

c.    On September 25, 2011 at 1:45 a.m., the next call from this phone was to (800)538-2929, which is a United Airlines reservation phone number.

## V.    CONCLUSION

17.    During her anonymous call to United Airlines, SARIOL did not directly state either man was a terrorist or was placing a bomb on a plane.  Nonetheless, Shan West, the recipient of the phone call at United Airlines, believed the call was about terrorists and bombs.  SARIOL acknowledged that it was reasonable for United Airlines to believe her call was about terrorists. SARIOL's subsequent text and Facebook messages to Oumahdi and Mansouri show that her intent was to harass them and get them in trouble with the FBI and police.  Proactive measures taken on September 25, 2011 to identify Mansouri and Oumahdi before they boarded an aircraft by the TSA and FBI, along with other agencies, demonstrate the threat was taken seriously and was believable to law enforcement.

18.    Based on the foregoing, I believe there is probable cause to believe that LIZET SARIOL violated 18 U.S.C. § 1038 by

///

///

///

17

making a false and misleading terrorist threat call to United

Airlines on September 25, 2011 in Los Angeles County, California.

/s/
_____
David Gates
Special Agent-FBI

Sworn and subscribed to before
me this 22nd day of November, 2011.

RALPH ZAREFSKY
_____
UNITED STATES MAGISTRATE JUDGE

18